FILED
2008 Sep-16  PM 02:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALTHA HARRELL,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:07-cv-524-JHH** |
| **STATE OF ALABAMA DEPARTMENT OF EDUCATION et al,** | ) ) ) | |
| **DEFENDANTS.** | ) | |

## MEMORANDUM OF DECISION

The court has before it the March 3, 2008 motion (doc. # 26) of defendants Alabama State Personnel Department ("SPD") and Jackie Graham ("Graham") for summary judgment. The court also has before it the April 10, 2008 motion (doc. # 30) of defendants Alabama Department of Education, Joseph B. Morton ("Morton") and Tommy R. Warren ("Warren") for summary judgment. Pursuant to the court's orders of April 17, 2008 (doc. # 33) and May 8, 2008 (doc. # 34), the motions were deemed submitted, without oral argument, on May 22, 2008.

## I.    Procedural History

Plaintiff Altha Harrell commenced this action on March 22, 2007 by filing a complaint in this court against five (5) defendants, alleging race discrimination and retaliation under 42 U.S.C. § 1981 and 42 U.S.C. § 1983 and discrimination in

violation of the Fourteenth Amendment.  More specifically, plaintiff contends that

defendants:[1]  (1) engaged in race discrimination as prohibited by 42 U.S.C. § 1981

through 42 U.S.C. § 1983 (Count One);[2] (2) engaged in retaliation as prohibited by 42

U.S.C. § 1981 though 42 U.S.C. § 1983[3] (Count Two); and (3) violated plaintiff's

rights under Fourteenth Amendment (Count Three).[4]

---

[1] In her Response in Opposition to Defendants' Motions for Summary Judgment, plaintiff concedes that her claims against the Alabama State Personnel Department and Jackie Graham, both individually and in official capacity, are due to be dismissed.  (See Doc. # 35 at n.1.) Therefore, summary judgment will be granted in favor of the Alabama State Personnel Department and Jackie Graham as to all claims asserted against them.

Plaintiff further concedes that her claims against the State of Alabama Department of Education and those against Joseph Morton and Tommy Warren, in their official capacities, are due to be dismissed on grounds of immunity.  (See Doc. # 35 at n. 1.)  Therefore, summary judgment will be granted in favor of the State of Alabama Department of Education as to all claims asserted against it.  Summary judgment will also be granted in favor of Joseph Morton and Tommy Warren in their official capacities.

Therefore, remaining in this case to be considered on the merits are *only* the individual capacity claims asserted against Joseph Morton and Tommy Warren.  (See Doc. # 35 at n. 1.) While the court received excellent briefs and evidentiary submissions from the defendants being summarily removed as discussed in this footnote, no useful purpose can be served by referring to such defendants other than in the concluding paragraph herein and the order referred to therein.

[2] Plaintiff's claim for race discrimination under 42 U.S.C. § 1981 is brought by virtue of 42 U.S.C. § 1983, as § 1981 provides no cause of action against a state actor and does not itself contain any remedial scheme. See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 731-32, 735 (1989); see also Butts v. County of Volusia, 222 F.3d 891, 892, 894 (11th Cir. 2000).  As such, plaintiff's 42 U.S.C. § 1981 claim of race discrimination merges with her 42 U.S.C. § 1983 claim. See Jett, 491 U.S. at 731-32.

[3] See footnote 2, supra as relevant to plaintiff's claim for retaliation.

[4] Plaintiff's claim for violation of the Fourteenth Amendment is brought by virtue of 42 U.S.C. § 1983.  No independent cause of action exists under the Fourteenth Amendment – 42 U.S.C. § 1983 remedies violations of rights created by federal law and the Constitution. See Maine v. Thiboutot, 448 U.S. 1 (1980).  As such, the Fourteenth Amendment claim will not be considered separately from the race discrimination and retaliation claims herein.

On April 10, 2008, defendants Morton and Warren filed a motion (doc. # 30) for summary judgment asserting that plaintiff's claims fail as a matter of law. Plaintiff, Morton, and Warren have filed briefs and submitted evidence in support of their respective positions.  Defendants Morton and Warren submitted a brief (doc. # 32) and evidence[5] (doc. # 31) in support of their motion for summary judgment on April 10, 2008.  On May 15 and 16, 2008, respectively, plaintiff filed a brief (doc. # 35) and evidence[6] (doc. # 36) in opposition to defendants' motions for summary judgment.  On May 22, 2008, defendants Morton and Warren filed a briefs (doc. # 37) in reply to plaintiff's opposition.

## II.   Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp.

---

[5] Defendants Morton and Warren submitted the following evidence: the deposition of Altha Harrell with exhibits; the deposition of Tommy Warren with exhibits; the affidavit of Tommy Warren, with exhibits; the affidavit of Norman Ippolito, with exhibits; the affidavit of Thomas Ray Hogan, with exhibits; and plaintiff's response to defendants' first interrogatories. Where relevant, the court has also considered the affidavit of Jackie Graham submitted by Graham in support of his motion for summary judgment "confessed" by plaintiff.

[6] The plaintiff submitted the following evidence: the deposition of Tommy Warren, with exhibits; and the deposition of Altha Harrell, with exhibits.

v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue

4

at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Prop., 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require

evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

## III.   Relevant Undisputed Facts[7]

### A.   Background and Organizational Structure

On January 23, 1980, Altha Harrell ("Harrell") began her employment with the Alabama Department of Education Disability Determination Service as a Disability Determination Examiner Assistant.  (Harrell Dep. at 13-14; Warren Aff. ¶ 19.)  On

---

[7] If the facts are in dispute, they are stated in a manner most favorable to the plaintiff.  See Fitzpatrick, 2 F.3d at 1115.

September 16, 1981, she was promoted to Examiner I.[8]  (Warren Aff. ¶ 19.)  She currently holds the position of Senior Specialist.[9]  In March 2006, three Senior Specialists, but not Harrell, were promoted to the position of Disability Determination Supervisor ("Unit Supervisor").  (Harrell Dep. at 16.)  Those promotion decisions form the basis of this lawsuit.

The Disability Determination office ("DDS") is Alabama's agency through which requests for benefits from Alabama citizens to the Social Security Administration ("SSA") are processed. (Warren Aff. ¶¶ 4-5.) The SSA develops and promulgates rigorous standards of performance for each level of disability determination within the DDS system's hierarchy.  (Warren Aff. ¶ 5.) The Alabama DDS has the option of administering the disability determination program in compliance therewith or ending its participation in the program.  (Warren Aff. ¶ 5.)

The DDS chooses to comply with SSA standards.   To facilitate such compliance, each employee's job performance is subject to periodic review in accordance with the Alabama Performance Appraisal System.  (Warren Aff. ¶ 8.)

---

[8] In 1998, the State Merit System positions of Examiner I, Examiner II, and Examiner III were reclassified to the positions of Disability Determination Specialist ("Specialist") and Senior Disability Determination Specialist ("Senior Specialist").  (Warren Dep. at 99; Warren Aff. ¶ 19; Harrell Dep. at 14-15.)

[9] Plaintiff held the position of Examiner III at the time of the reclassification, and thus became a Senior Specialist on March 14, 1998.  (Exh. A to Warren Aff.)

Each individual employee's discrete job responsibilities are scored on a scale of zero to four (0-4). (Warren Aff. ¶ 11.) A score of zero exhibits a complete failure to meet SSA's standards, whereas a score of four shows the employee "consistently exceeds standards" for the specific Responsibility (essential job function) during the particular appraisal period.[10] (Warren Aff. ¶ 18.) The scores themselves are generated primarily by the employee's own work product. (Warren Aff. ¶ 11; Harrell Dep. at 33-38.)

The DDS computer randomly assigns new cases to Senior Specialists. (Warren Aff. ¶ 11.) It also tabulates automated data collected from the employee's desk top computer into statistical form that corresponds to four of the Senior Specialist's five job responsibilities: Quality of Work, Aged Case Control, Productivity, and Developmental Quality. (Warren Aff. ¶ 11.) Those four responsibilities are measured purely objectively based on the number of the individual's own errors, efficiency, and output. (Warren Aff. ¶¶ 11-15; Harrell Dep. at 33-34.) The remaining responsibility, Senior Specialist Duties, is measured subjectively by the Senior Specialist's Unit

---

[10] More specifically:

    0 = Does Not Meet Standards
    1 = Partially Meets Standards
    2 = Meets Standards
    3 = Exceeds Standards
    4 = Consistently Exceeds Standards

(Warren Aff. ¶ 18.)

Supervisor and includes tasks such as serving as a positive role model within the unit, taking initiative in assisting other Specialists, and being supportive of the unit and agency's goals and objectives. (Warren Aff. ¶¶ 11, 16.)

Every week, each individual employee receives a spreadsheet printout of his or her job performance in each responsibility.[11] (Warren Aff. ¶ 17; Harrell Dep. at 36.) If an employee fails to meet standards for any responsibility, the employee's Unit Supervisor must work with the employee to implement a Plan of Action to correct the deficiencies. (Warren Aff. ¶ 11.) At the mid-appraisal (6 month) and final appraisal (annual) periods, the employee meets with the Unit Supervisor, who also serves as the "rating supervisor." (Warren Aff. ¶ 18; Harrell Dep. at 39-40.) At the meeting, the employee is provided a cumulative report and a discussion ensues regarding responsibility scores and cumulative appraisal score. (Warren Aff. ¶ 18; Exh. 5 to Harrell Dep.) The District Supervisor, who also serves as the "reviewing supervisor," then reviews each employee's mid-appraisal and annual forms. (Warren Dep. at 100; Exhs. C, D, I-O to Warren Aff.)

The scores for each of the five responsibilities are then added together and the sum is divided by the number of responsibilities to obtain an average responsibility

---

[11] The automated data are tabulated weekly, monthly, quarterly, semi-annually, and annually, and provide a statistical basis for the overall productivity of each of the three Operations Units and the DDS as a whole. (Warren Aff. ¶ 17.)

rating, which is then multiplied by ten (10) to determine the responsibility score for the employee. (Warren Aff. ¶ 18.) Thereafter, if the employee has been disciplined for any reason during the appraisal period, the responsibility score is reduced by any applicable discipline score. (Warren Aff. ¶ 18.) The final total denotes the employee's "Performance Appraisal Score" for the year. (Warren Aff. ¶ 18.) The ranges for Performance Appraisal Scores are as follows:

| | | |
|---|---|---|
| 6.6 or below | = | Does Not Meet Standards |
| 6.7-16.6 | = | Partially Meets Standards |
| 16.7-26.6 | = | Meets Standards |
| 26.7-36.6 | = | Exceeds Standards |
| 36.7-40 | = | Consistently Exceeds Standards |

(Warren Aff. ¶ 18; Exh. 2 to Harrell Dep.)

**B.    Altha Harrell's Job Performance**

For the period of January 1, 2001 though January 1, 2002, Harrell's appraisal score was 26 (meets standards) with a score of zero included therein for failure to meet standards in quality. (Exh. 7 to Harrell Dep.; Warren Aff. ¶ 20.) A Plan of Action was developed by Harrell and her Unit Supervisor, Larry Powers, a black male, to assist her in meeting that standard. (Exh. 7 to Harrell Dep.; Warren Aff. ¶¶ 4, 20.)

On May 8, 2002, Harrell requested six weeks of leave to care for a sick family member. (Warren Aff. ¶ 21; Harrell Dep. at 56-57.) Harrell's leave was granted and

occurred from May 13 through June 24, 2002. (Warren Aff. ¶ 21.) While Harrell was on leave, an audit of her caseload was performed in accordance with DDS policy. (Exh. B to Warren Aff.; Warren Aff. ¶ 21.)  The audit randomly selected 57 of Harrell's 130 cases and revealed that 34 contained developmental errors, which resulted in a deficiency rating of 59.6%. (Exh. C to Warren Aff.; Warren Aff. ¶ 21.) In addition to the errors in development, the review of Harrell's files revealed numerous failures to follow instructions and poor organization making it difficult for the quality examiner to follow the paper trail to audit the cases. (Exh. C to Warren Aff.)

On June 25, 2002, the day that Harrell returned to work, she met with District Supervisor Ray Hogan to review the results of the audit and implement a Plan of Action to address the high number of errors. (Warren Aff. ¶ 22; Harrell Dep. at 58.) During that meeting, Hogan issued to Harrell a verbal warning, the first step in progressive discipline.[12] (Exh. D to Warren Aff.; Harrell Dep. at 59.)

---

[12] A verbal warning carries with it no point value to be deducted from Performance Appraisal scores. (Warren Aff. ¶ 22.)  Therefore, no points were deducted from Harrell's annual appraisal for that period as a result of the verbal warning. (Harrell Dep. at 58; Exh. C to Harrell Dep.)

On August 9, 2002 Harrell filed EEOC charge number 130-A-202759 in which she asserted that the audit and verbal discipline were racially discriminatory. (Warren Aff. ¶ 23; Harrell Dep. at 8-10; Exh. E to Warren Aff.)  The EEOC issued a "no cause" finding, dismissal, and right to sue letter on September 16, 2002. (Exh. E to Warren Aff.)  No lawsuit (other than this one) ensued. (Harrell Dep. at 8-9.)

Harrell's job performance improved to a score of 30 (exceeds standards) on December 17, 2002. (Warren Aff. ¶ 24; Exh. 6 to Harrell Dep.) On December 15, 2003, Harrell's performance was rated 32 (exceeds standards). (Warren Aff. ¶ 25; Exh. 5 to Harrell Dep.) That combined score included a 4 (consistently exceeds standards) in Aged Case Control and Productivity and a 1 (partially meets standards) in Quality, which necessitated implementing a Plan of Action on that issue. (Warren Aff. ¶ 25; Exh. 5 to Harrell Dep.)

For 2004, Harrell's performance score dropped to a 28 (exceeds standards), which included scores of 3 for quality, productivity, and developmental quality, and a 1 (partially meets standards) for aged case control, which again necessitated a Plan of Action. (Warren Aff. ¶ 26; Exh. 4 to Harrell Dep.) Harrell's performance improved to a 38 (consistently exceeds standards) for December 2005, which included all 4's in every area of responsibility except for quality, in which she achieved a level 3. (Warren Aff. ¶ 27; Exh. 3 to Harrell Dep.)

C.    **The Promotion Decisions**

In early 2006, the Director of DDS, Tommy Warren, became aware of the need to fill three Supervisor positions. (Warren Aff. ¶ 28.) He requested a Certificate of Eligibles (or "register") from the State Personnel Department ("SPD") in accordance with Alabama Administrative Code r. 670-X-9-.03(2)(a), which register was issued

on February 17, 2006.[13]  (Warren Aff. ¶¶ 28, 29; Exh. G to Warren Aff.; Warren Dep.

at 38-39.)   The register was created in accordance with the "Announcement of

Continuous Merit System Examination." (Exh. 1 to Warren Dep.)

> A promotional register will be established by an evaluation of the
> applicants' education and experience as shown on their application.
> This evaluation will compromise 95% of the final score, and an average
> of service ratings for the last three years will comprise the remaining
> 5%.[14]   (Exh. 1 to Warren Dep.)

If an individual desires to be considered for placement on the register, she is to return

the Application for Examination form as directed in the How to Apply section of the

Announcement of Continuous Merit System Examination.  (Exh. 1 to Warren Dep.)

The highest of ten eligibles (the "Rule of Ten"), in accordance with the SPD's

personnel selection procedures, are then certified on the employment register, along

with the names of all those whose grades are tied with the tenth highest eligible

individual for each additional vacancy.  (Warren Dep. at 55-56; Warren Aff. ¶ 28,

Exh. F.)  Thereafter, *anyone* listed on the register may be chosen to fill the vacancy

---

[13] See also Ala. Code § 36-26-65 (Application of State Merit System to DDS employees).

[14] Plaintiff attempts to argue that "the *announcement* for the subject position states that an evaluation of the applicants' education and experience would compromise 95 percent of the *criteria for the position*, while an average of the service ratings for the past three years would make up the remaining 5 percent." (Doc. # 35 at 2, first and second emphases added.)  This bald statement is not supported by the facts in the record.  While eligibility for name placement on the *register* is explained by the Announcement, there is nothing in the record to suggest that the same criteria for placement on the register applies to final selection for available positions.  In fact, all of the evidence is to the contrary.  (Graham Aff. ¶ 15; Exh. 1 to Warren Dep.)

regardless of their numerical placement on the list. (Exh. F to Warren Aff.; Graham Aff. ¶ 15.) That is, after the register has been created, those individuals on the register are all in the same pool of candidates and the SPD "does not have any involvement, authority, or control as to who is hired or promoted off a [Certificate of Eligibles] provided to an agency." (Graham Aff. ¶ 15.)

On February 22, 2006, Warren sent an email to everyone listed on the register to inform them of the vacancies for Disability Determination Supervisor. (Warren Dep. at 40; Warren Aff. ¶ 30.) Harrell indicated her interest in the positions and was interviewed along with eight other candidates on or about February 27, 2006. (Warren Aff. ¶ 31; Hogan Aff. ¶ 5; Ippolito Aff. ¶ 7.) Each candidate was asked the same questions, and upon completion of the interviews Ray Hogan (District Supervisor), Norman Ippilito (Operations Manager), and Warren met to discuss the candidates' performance appraisals, interview performances, and overall suitability for the position of Unit Supervisor. (Warren Dep. at 89, 100; Warren Aff. ¶ 31; Hogan Aff. ¶ 14; Ippolito Aff. ¶ 15.) The three noted that Harrell failed to provide correct responses to objective questions that were designed to permit the candidate to demonstrate her understanding of the tasks performed in the position of Senior Specialist, a position in which Harrell had worked for almost 20 years. (Warren Dep. at 91; Hogan Aff. ¶ 6, Ippolito Aff. ¶ 8.) The three also commented that Harrell was

not taking the interview process seriously, as evidenced by her giggling and acting silly during the interview.  (Hogan Aff. ¶ 7; Ippolito Aff. ¶ 9; Warren Aff. ¶ 31.)

Three candidates stood out to the interviewers at the conclusion of the interview process – Olivia Lindsey (white female), Cindy Vaughan (white female), and Vanessa Daniel (black female) – and those three were recommended for promotion.  (Exhs. H-K of Warren Aff.; Warren Dep. at 83-84; Exh. 2 to Warren Dep.)  They each exhibited to the interviewers sound knowledge of their incumbent positions and a professional attitude during the interview process.  (Hogan Aff. ¶¶ 10-13; Ippolito Aff. ¶¶ 11-14.)  The individual performance appraisal scores for each of those individuals compare to Harrell's as follows:[15]

|          | 2002 | 2003 | 2004 | 2005 |
|----------|------|------|------|------|
| Harrell  | 30   | 32   | 28   | 38   |
| Daniel   | 34   | 40   | 40   | 40   |
| Lindsey  | 40   | 40   | 40   | 40   |
| Vaughan  | 40   | 40   | 40   | 40   |

(Exhs. I-K to Warren Aff.; Exhs. 3-7 to Harrell Dep.)  At the time of the selection, Harrell had 26 years of experience with the DDS,[16] compared to Vaughan's 13 years

---

[15] Although Warren did not know specific performance ratings of the four pertinent candidates at the time of the decision, he did know that Vaughan, Lindsey, and Daniel generally had higher scores on their performance appraisals than did Harrell.  (Warren Dep. at 100-102.)

[16] Harrell also had 19 years of supervisory experience as a commissioned officer with the United States Naval Reserves.  (Harrell Dep. at 108.)  That experience included being a supervisor of over 200 people in two units and being the administration officer for over 700 people in 16 units.  (Harrell Dep. at 22, 23, 125.)  While an officer, Harrell also served on a

of experience and Lindsey's "less" years of experience.  (Harrell Dep. at 68-69.)

On March 23, 2006, Lindsey, Vaughan, and Daniel were informed by Warren that they had been selected to fill the three vacant Unit Supervisor positions.  (Warren Aff. ¶ 35; Exh. M to Warren Aff.)

### D.    The Instant Lawsuit and Investigation

On March 27, 2006, Harrell filed EEOC charge number 420-2006-01584, alleging race and age discrimination and retaliation based on the fact that she was not selected for the March 23, 2006 Unit Supervisor positions.  (Exh. N to Warren Aff.; Warren Aff. ¶ 34.)  On May 18, 2006, the EEOC issued a notice of right to sue letter to Harrell.  (Exh. N to Warren Aff.)  Harrell filed this lawsuit on March 22, 2007, alleging that she was denied a promotion in March 2006.[17]

## IV.   Applicable Substantive Law and Analysis

In her Complaint, Harrell alleges, in pertinent part,[18] that in 2006 she applied and was qualified for the position of Disability Determination Supervisor, yet was not selected.[19]  She contends that the failure to select herself for the position constitutes

---

selection board and evaluated subordinates regularly.  (Harrell Dep. at 133.)

[17] See footnote 19, infra.

[18] See footnote 1, supra.

[19] Although plaintiff's Complaint states that Ronnie Kilgore, a less qualified white male, was selected for the position she desired, (see compl. ¶ 15), Plaintiff's Response in Opposition to

discrimination on the basis of race and retaliation as prohibited by 42 U.S.C. § 1981

and violation of the Fourteenth Amendment of the United States Constitution.[20]

---

Defendants' Motions for Summary Judgment makes clear that Harrell is contesting the selections of Lindsey and Vaughan, white females, to the DDS positions in 2006. (See Doc. # 35 at 2-5, 14-15.) Moreover, the evidence is undisputed that Ronnie Kilgore was promoted to the position of Supervisor in Mobile on June 25, 2005, a position which Harrell did not desire because it was located outside of Jefferson County. (Warren Aff. ¶ 37; Harrell Dep. at 83-84; Exh. 10 to Harrell Dep.; Exh. O to Warren Aff.)

[20] See footnotes 1, 2, 3, and 4, supra.

Defendants contend that they are entitled to qualified immunity in their individual capacities and thus no claim for race discrimination or retaliation can stand. The court agrees. Qualified immunity offers "complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); see also Crawford v. Carroll, 529 F.3d 961, 977 (11th Cir. 2008). In effect, qualified immunity "allow[s] government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Id. (internal quotations omitted).

The Supreme Court has established a two-part test for evaluating a claim of qualified immunity. The threshold question is whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts show [that the official's] conduct violated a constitutional right?" Crawford, 529 F.3d at 977, quoting Saucier v. Katz, 533 U.S. 194 (2001). If a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine "whether the right was clearly established." Id. "For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." Crawford, 529 F.3d at 977-78, quoting Riley v. Newton, 94 F.3d 632, 636 (11th Cir. 1996) (quotations omitted). As such, qualified immunity affords "protection to all but the plainly incompetent or those who knowingly violate the law." Crawford, 529 F.3d at 978, quoting Malley. Briggs, 475 U.S. 335 (1986). The Eleventh Circuit has noted that if the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. Crawford, 529 F.3d at 978, quoting Vinyard, 311 F.3d at 1350.

As discussed completely below, the law did not put the individual defendants on notice that their conduct would be clearly unlawful. In fact, defendants followed the procedures of the SSA to establish the register, and from there made promotion decisions based on the

## A.    Race Discrimination under 42 U.S.C. § 1981

42 U.S.C. § 1981 prohibits employers from discriminating against employees because of their race.  In the Eleventh Circuit, § 1981 race discrimination claims are analyzed using the same framework as Title VII claims.  See Hudson v. Mr. Burch Formal Wear, Inc., 2006 WL 2351837, No. 05-16269, at *1 (11th Cir. Aug. 15, 2006) (citing Cooper v. Southern Co., 390 F.3d 695, 724-25 (11th Cir. 2004)); see also Rice-Lamar v. City of Ft. Lauderdale, Fla., 232 F.3d 836, 843 n. 11 (11th Cir. 2000) and Cross v. Alabama, 49 F.3d 1490, 1507-08 (11th Cir. 1995).  Thus, to succeed on a § 1981 race claim, the plaintiff bears the burden of producing a prima facie case of discrimination.  Holifield v. Reno, 115 F.3d 1555, 1561 (11th Cir. 1997).  A plaintiff may discharge his burden by offering "direct evidence, circumstantial evidence or statistical evidence."  Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

Since plaintiff proceeds herein using only circumstantial evidence,[21] she must show as an initial matter: (1) that she belongs to a protected class; (2) that she applied

_____

performance of the candidates.  See discussion Section IV.A. and B., infra.  Therefore, they are entitled to qualified immunity from plaintiff's claims.  In the interest of thoroughness, however, the court will nevertheless consider the merits plaintiff's claims for race discrimination and retaliation.

[21] Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (doc. # 35) analyzes the case only from the standpoint of the McDonnell Douglas burden-shifting framework used for circumstantial cases.  (Doc. # 35 at 11-16.)

for and was qualified for the position for which the employer was seeking applicants; (3) that she was denied the promotion; and (4) that another equally or less qualified individual outside of the protected class received the promotion or that the position remained open. See Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir. 2005); see also Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004). If Harrell produces sufficient evidence to establish the prima facie case, the burden shifts to defendants to articulate a legitimate, non-discriminatory reason for the promotion decision. See Vessels, 408 F.3d at 767; see also Carter v. Three Springs Residential Treatment, 132 F.3d 635, 642-43 (11th Cir. 1998). Upon articulation, the burden shifts back to Harrell to prove that the articulated reason was as a pretext for discrimination. See id. at 643; see also McDonnell Douglas v. Green, 411 U.S. 792, 802-03 (1973).

One method of proving pretext is showing that the employer's proffered explanation is unworthy of credence. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 517 (1993). It is upon this method of proving pretext that Harrell relies. (See Doc. # 35 at 12-13.) However, where qualification is at issue, "a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [individual] who received the position he coveted. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were

in fact motivated by race.  We have explained, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where the reason is one that might motivate a reasonable employer." Alexander v. Fulton County, 207 F.3d 1303, 1339 (11th Cir. 2000) (internal quotations omitted).

Plaintiff alleges that she was discriminatorily denied the DDS position in March 2006 and that two less qualified white females were chosen over herself.[22] For purposes of summary judgment, the court assumes, without deciding, that plaintiff has established a prima facie case of race discrimination for both of those positions.

### 1.  Defendants have articulated legitimate, non-discriminatory reasons for choosing Lindsey and Vaughan for the DDS positions.

Consistent with their burden of production under McDonnell Douglas, defendants articulate legitimate, non-discriminatory reasons to support their decision to select Olivia Lindsey and Cindy Vaughan for the DDS positions.  Harrell had historical inconsistencies in her job performance, while Lindsey and Vaughan consistently performed at the highest possible level.[23] (Exhs. I-K to Warren Aff.;

---

[22] See footnote 19, supra.

[23] While Warren admits that he did not know specific performance ratings of the four pertinent candidates at the time of the decision, he clearly states that he did know that Vaughan, Lindsey, and Daniel had generally higher scores on their performance appraisals than did Harrell. (Warren Dep. at 100-102.)  See footnote 15, supra.

Exhs. 3-7 to Harrell Dep.)  Harrell failed to accurately answer objective questions and acted "flighty" during her interview, while Lindsey and Vaughan answered objective questions completely and correctly and comported themselves professionally during the interview.  (Hogan Aff. ¶¶ 7, 10-13; Ippolito Aff. ¶¶ 9, 11-14; Warren Dep. at 91.) See Chapman, 229 F.3d at 1033-35 ("Subjective evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becoming more so in our increasingly service-oriented economy . . . Personal qualities also factor heavily into employment decisions concerning supervisory or professional positions."); see also Denney v. City of Albany, 247 F.3d 1172, 1186 (11th Cir. 2001) ("Personal qualities . . . factor heavily into employment decisions concerning supervisory or professional positions.  Traits such as common sense, good judgment, originality, ambition, loyalty, and tact often must be assessed primarily in a subjective fashion, yet they are essential to an individual's success in a supervisory or professional position.").   Thus, the presumption of discrimination is eliminated, thereby shifting the burden to Harrell to come forward with sufficient evidence to permit a reasonable fact-finder to find that the articulated reasons are pretextual.  See Chapman, 229 F.3d at 1028; see also Grigsby v. Reynolds Metal Co., 821 F.2d 590, 594 (11th Cir. 1987) (holding that plaintiff's burden at this stage is exacting; she can only prevail through significantly probative evidence that the proffered reasons are

a pretext for discrimination).

### 2.   Harrell has not established that defendants' articulated legitimate, non-discriminatory reasons are a pretext for discrimination.

Counsel for plaintiff argues that Harrell's qualifications were "plainly superior" to those of Lindsey and Vaughan, as demonstrated by her education, experience handling complex cases, and leadership experience as a military officer.[24] (See Doc. # 35 at 14-15.) Harrell agrees and says that, "from my perspective, you [defendants] did not analyze, review, and determine that I had more education, more experience, my military experience." (Harrell Dep. at 94.) Harrell also adds that she "love[s] working" and so "do[es] it all" when it comes to her job responsibilities, even though she could not recount the specific duties of a senior examiner. (Harrell Dep. at 38.)

The problem with plaintiff's pretext arguments are that they do nothing other than question the wisdom of the decision reached by defendants to choose Lindsey and Vaughan over Harrell for the DDS positions. See Alexander v. Fulton County, Ga., 207 F.3d 1303, 1339 (11th Cir. 2003). Harrell's longevity with the company, along with her military experience, can indeed be construed as a positive factors suggesting that Harrell may be a viable candidate for the position. But those factors

---

[24] The argument that defendants failed to put the proper emphasis on criteria set forth by the Announcement of Continuous Merit Examination is wholly without merit and will not be considered herein. See footnote 14, supra.

do not outweigh the articulated strengths of Lindsey and Vaughan, which plaintiff does nothing to rebut. See Ash v. Tyson Foods, Inc., 190 Fed. Appx. 924, 927 (11th Cir. 2006) ("[C]omparative qualifications and other alleged indica of discrimination (i.e., subjective criteria used by the decision-maker, plaintiff's belief that his (or her) qualifications were superior), were held insufficient for a factfinder reasonably to find that the decision was not based on the qualifications of the applicants."). That is, Harrell has not met her burden under Cooper v. Southern Co. to show that the disparities between her qualifications and those of Lindsey and Vaughan were "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen" Lindsey and Vaughan over Harrell.[25]  390 F.3d 695, 732 (11th Cir. 2004). And it is not the job of the court to second-guess the wisdom of an employer's decision as long as the decision is not motivated by race. See Alexander, 207 F.3d at 1341.

Thus, Morton and Warren are entitled to summary judgment on plaintiff's 42 U.S.C. § 1981 race discrimination claim.

---

[25] This is not a situation in which the court believes that the employer misjudged the qualifications of the candidates.  And even if it were, such a situation would not necessarily expose defendants to liability.  See Walker v. Mortham, 158 F.3d 1177, 1190 (11th Cir. 1998), cert. denied, 528 U.S. 809 (1999).

## B.     Retaliation under 42 U.S.C. § 1981

Count Two of the Complaint alleges that defendants retaliated against Harrell on the basis of her race in violation of 42 U.S.C. § 1981.  Title VII clearly prohibits an employer from discriminating against any individual for participation in or opposition to unlawful employment practices.  See 42 U.S.C. § 2000e-3(a).  Since May 27, 2008 it has been equally as clear that 42 U.S.C. § 1981 encompasses retaliation claims.  CBOCS West, Inc. v. Humphries, 128 S.Ct. 1951 (2008).

To establish a prima facie case of retaliation, Harrell must show: (1) that she engaged in protected activity or expression; (2) that she suffered an adverse employment action; and (3) that the adverse employment action was causally connected to the protected conduct.  See Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1388 (11th Cir. 1998); see also Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1494 (11th Cir. 1989).  If Harrell is able to meet that initial burden, the task shifts to defendants to articulate legitimate, non-discriminatory reasons for the alleged retaliatory acts.  See Phillips v. Aaron Rents, Inc., Slip Copy, 2008 WL 111038, No. 07-11477 at *8 (11th Cir. Jan. 11, 2008) ("Retaliation claims are also analyzed under the McDonnell Douglas burden-shifting framework.") (citing Holifield, 115 F.3d at 1566).  Upon articulation, Harrell must demonstrate that defendants' proffered explanation is a pretext for retaliation in order for her claim to

survive summary judgment.  See id.

### 1.   Harrell has wholly failed to establish a prima facie case of retaliation.

Harrell summarily states that she participated in a protected activity, but does not make clear what that statutorily protected expression might be.  (See Doc. # 35 at 16-17.)  The court is aware that to recover for retaliation, Harrell need not make a "formal" protest; informal complaints to superiors about unlawful discrimination are clearly within the scope of statutorily protected conduct.  Rollins v. State of Fla. Dep't of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989).  But Harrell mentions no protest regarding discriminatory conduct other than a charge of discrimination she filed with the EEOC on August 9, 2002.  (See Doc. # 35 at 2.)  Thus, for her claim of retaliation to survive summary judgment, she must establish a causal connection between the August 9, 2002 charge and her failure to be promoted in March 2006. See Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993) ("In order to establish the requisite 'causal link' required as part of a prima facie case, a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated.'"); see also Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000).

It is well established in this Circuit that a substantial delay between the

protected activity and the negative employment action, where there is no other evidence of causation, is insufficient to establish a causal connection. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001). Here, there is *no* allegedly adverse employment decision even close to the protected act – the decision not to promote Harrell came nearly *four years* after the filing of her EEOC charge of discrimination. A claim for retaliation cannot be supported under those facts. See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361 (11th Cir. 2007) ("In opposing summary judgment, [plaintiff] failed to present evidence from which a reasonable jury could find any causal connection between her . . . complaints of sexual harassment and the termination of her employment three (3) months later."); see also Higdon v. Jackson, 393 F.2d 1211, 1220 (11th Cir. 2004) (noting that the Supreme Court cited with approval cases stating that a 3 to 4 month disparity between the activity and the adverse action was insufficient to find a causal connection).

Because Harrell has failed to establish a causal connection between her protected activity and the allegedly adverse action of defendants, her claim of retaliation necessarily fails.

> **2.    Harrell's failure to rebut defendants' articulated legitimate nondiscriminatory reasons for the alleged retaliation is fatal to her claims of retaliation.**

Even assuming, *arguendo*, that Harrell has established a prima facie case of

retaliation, her claim nevertheless fails because she cannot show that defendants' articulated legitimate nondiscriminatory reasons for the allegedly adverse act were a pretext for retaliation. As thoroughly discussed in Section IV.A., *supra*, not only does Harrell clearly fail to refute all of the articulated reasons for the adverse decisions, but the "evidence of pretext" that she does present does nothing more than quibble with the reasons given by the defendants. For this separate reason, Harrell's claim of retaliation fails.

## V.    Conclusion

For the reasons asserted above, there being no dispute as to any material fact, the motion (doc. # 30) of defendants Morton and Warren for summary judgment in their favor are due to be granted. Further, for the reasons stated in footnote 1, the motions (docs. # 26, 30) of defendants Alabama State Personnel Department, Jackie Graham, and Alabama Department of Education, for summary judgment in their favor, are also due to be granted. A separate order will be entered dismissing all claims.

**DONE** this the ___*16*___ day of September, 2008.

_____

SENIOR UNITED STATES DISTRICT JUDGE